**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL MINER, individually and on behalf of others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:14-cv-07474 |
| GOVERNMENT PAYMENT SERVICE, INC. d/b/a GOV PAY NET, | ) ) ) | Judge Robert M. Dow, Jr. |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff brings this diversity action against Defendant, alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq.* and common law claims of unjust enrichment, fraud, and conversion. Before the Court is Defendant's motion to dismiss [24]. For the reasons stated below, the Court grants Defendant's motion [24] in part and denies in part, dismissing Counts II and IV. In addition, the motion for an extension of time to complete class discovery [36] is granted; class discovery deadline is extended to 8/31/2015. Status hearing set for 6/9/2015 is stricken and reset to 8/25/2015 at 9:00 a.m.

**I.     Background[1]**

Plaintiff alleges that from approximately 2005 to 2012, Defendant contracted with the Clerk of the Circuit Court of Cook County and Cook County Department of Revenue to provide bail and bond services. [19] at ¶ 17. As part of these services, Defendant provided payment

---

[1] For the purposes of Defendant's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the amended complaint. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

processing services when individuals made bail-related payments using credit or debit cards. *Id.* at ¶¶ 8, 17. Payment processors ordinarily charge a merchant a direct fee for their services. *Id.* at ¶ 10. Governmental merchants like Cook County, however, frequently reject such fees. *Id.* As a result, processors sometimes attempt to collect a convenience fee from a cardholder instead. *Id.* Their ability to do so depends on the rules of the debit/credit card association. *Id.* Some associations, including Visa, for example, prohibit a payment processor from charging consumers any such fee. *Id.*

According to Plaintiff, Defendant charged individuals making bail payments a fee. *Id.* at ¶¶ 17, 21, 26. In its communications with Visa, Cook County, and others, it characterized this fee as a merchant fee, not a payment processing fee. See *id.* at ¶¶ 12, 13. The services it provided as a merchant were allegedly "bail bond services," *id.* at ¶ 13, which Plaintiff argues are unlawful under 725 ILCS 5/110-7, 110-8, and 110-15.

In September 2011, Plaintiff used his credit card to pay the Illinois Clerk of Court a bail deposit of $2,612 for two traffic citations. *Id.* at ¶¶ 20, 21. Defendant charged Plaintiff for the $2,612 bail deposit and an additional 8% (or $208.96) for providing him bail and bond services. *Id.* at ¶ 21. The government then voluntarily dismissed Plaintiff's citations, and the court directed the clerk of court to refund the full amount of bail paid. *Id.* at ¶ 23. Defendant did not refund or reimburse Plaintiff the 8% additional charge for the bail and bond services. *Id.* at ¶ 24.

Plaintiff alleges that because Defendant's bail and bond services violate the letter and spirit of 725 ILCS 5/110-7, 110-8, and 110-15, Defendant's charge for those services is an unfair business practice and deceptive business practice under the ICFA, 815 ILCS 505/1 *et seq.* (Counts I and II). He also alleges common law claims of unjust enrichment (Count III), fraud

(Count IV), and conversion (Count V). He brings these claims on behalf of himself and a class of similarly situated Illinois citizens.

## II.     Legal Standard

The purpose of a Rule 12(b)(6) motion to dismiss is not to decide the merits of the case; a Rule 12(b)(6) motion tests the sufficiency of the complaint. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). As previously noted, reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in his favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*,

195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

III.    **Analysis**[2]

Defendant moves to dismiss all claims for lack of Article III standing; the ICFA and common law fraud claims (Counts I, II and IV) under Rules 12(b)(6) and 9(b); and the unjust enrichment claim (Count III) under Rule 12(b)(6). The Court addresses each argument in turn.

A.    **Article III Standing**

Defendant argues as a threshold matter that Plaintiff lacks Article III standing. For Article III standing to exist, a plaintiff must allege "an injury-in-fact that is fairly traceable to the defendant's conduct and that could likely be redressed by a favorable court decision." *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 808 (7th Cir. 2013). Defendant moves to dismiss, arguing that Plaintiff fails to allege the first two requirements of standing: (1) injury-in-fact that is (2) fairly traceable to Defendant.

To plead injury-in-fact, a plaintiff must allege "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citations and internal quotation marks omitted). By alleging that Defendant charged him a fee, Plaintiff has pled a sufficiently concrete and actual monetary injury. Defendants' arguments to the contrary are unpersuasive. Defendant first argues that Plaintiff's injury is "speculative * * * because it requires multiple legal conclusions in Plaintiff's favor in order for the fee to be an unpermitted one." [25] at 11. This argument confuses standing with a merits analysis. Only after the Court

---

[2] The Court notes as a preliminary matter that it has subject matter jurisdiction because the parties are diverse and the amount at stake exceeds $75,000. See 28 U.S.C. § 1331. Plaintiff and the class are citizens of Illinois, Defendant is a citizen of Delaware and Indiana, and the amount at stake, assuming class certification, is $5 million.

addresses the merits of this case does it address the lawfulness of the fee. See *Bruggeman ex rel.*

*Bruggeman v. Blagojevich*, 324 F.3d 906, 909 (7th Cir. 2003) ("Of course if his claim has no

merit, then he has not been injured by any wrongful conduct of the defendant; but if the

consequence were that he lacked standing, then every decision in favor of a defendant would be

a decision that the court lacked jurisdiction, entitling the plaintiff to start over in another court.").

Defendant also argues that "Plaintiff wholly ignores that he received a benefit from the ability to

use his credit card to post his own bail." [35] at 8. Again, to the extent that Defendant argues that

it charged a fee pursuant to a lawful exchange of money for services, it raises a merits argument,

not a standing argument. Lastly, Defendant argues that Plaintiff may not "sue the governmental

unit's contractor over a benefit legally established and provided by such governmental unit that

Plaintiff willfully accessed." *Id.* at 9. In a similar vein, it argues that if Plaintiff suffered an

injury-in-fact, "it was at the hands of the Illinois legislature which permitted Cook County to

make available to Plaintiff the option to use his credit card to post his bail, if he so chose to,

under the terms the county permitted." *Id.* Both arguments go to whether Defendant is a proper

Defendant, not whether Plaintiff suffered a concrete monetary injury. Accordingly, the Court

concludes that Plaintiff has alleged an injury-in-fact.[3]

---

[3] In arguing that Plaintiff fails to allege injury-in-fact, Defendant also cites *Two Jinn, Inc. v. Gov't Payment Serv., Inc.*, 2010 WL 1329077, at *3 (S.D. Cal. Apr. 1, 2010), a case that is distinguishable. The plaintiff there was one of Defendant's competitors, and the alleged injury-in-fact was the plaintiff's loss of customers. More specifically, the plaintiff there alleged that Defendant failed to comply with costly regulatory requirements, that it obtained a competitive advantage, and that it thereby diverted bail customers from law abiding bail agents like the plaintiff. The court found that the injury was conjectural because plaintiff "has not, and likely could not, point to any potential customers who would have purchased bail from sources other than Defendant, much less Plaintiff." *Id.* at *3. The alleged injury here is distinguishable insofar as Plaintiff alleges that Defendant actually charged him a fee. Defendant additionally cites *Two Jinn, Inc. v. Gov't Payment Serv., Inc.*, 183 Cal. Rptr. 3d 432, 443 (Cal. Ct. App. 2015), which also is inapposite in that it addresses statutory standing under California's Unfair Competition Law, not Article III standing.

Turning to the second requirement, "there must be a causal connection between the injury and the conduct complained of" for an injury to be "fairly traceable" to a defendant. *Lujan*, 504 U.S. at 560. The injury may not be the result of "independent action of some third party not before the court." *Id.* (citations and internal quotation marks omitted). Defendant argues that "[b]y filing suit against GovPayNet alone and ignoring Cook County's direct role in defining the terms of the payment program that GovPayNet administered on the county's behalf, Plaintiff failed to adequately plead the necessary causal link between the claimed injury and GovPayNet's conduct." [25] at 12. The Court disagrees. Defendant charged Plaintiff a fee. The fee is therefore fairly traceable to Defendant. Whether or not the fee was charged pursuant to Defendant's contract with the government is immaterial to whether the fee is fairly traceable to Defendant. Accordingly, the Court denies Defendant's motion to dismiss for lack of standing.

### B.    ICFA and Fraud Claims

Defendant argues that the ICFA and fraud claims (Counts I, II, and IV) fail under Rules 12(b)(6) and 9(b). To state a claim under the ICFA, a plaintiff must allege "(1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; and (3) the unfair or deceptive practice occurred during a course of conduct involving trade or commerce." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934 (7th Cir. 2010) (citing *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)). To state a claim of common law fraud, a plaintiff must allege "(1) a false statement or omission of material fact; (2) knowledge or belief of the falsity by the party making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and

(5) damage to the other party resulting from such reliance." *Weidner v. Karlin*, 932 N.E.2d 602, 605 (Ill. App. Ct. 2010).

Defendant argues that the ICFA and fraud claims fail under Rule 12(b)(6) because (a) Defendant does not, in fact, provide bail and bond services (it only provides payment processing services), and (b) even if it did provide bail and bond services, such services are not prohibited under 725 ILCS 5/110-7, 110-8, and 110-15. The first argument is premature. On motion to dismiss under 12(b)(6), the Court takes as true Plaintiff's factual allegations, including the allegation that Defendant provides bail and bond services, some but not all of which are payment processing services. As to the second argument, the Court agrees that the plausibility of Count II's claim of a deceptive business practice and Count IV's claim of fraud turn on whether Defendant's services violated 725 ILCS 5/110-7, 110-8, and 110-15. See [19] at ¶ 50 ("The above-described practices were deceptive within the meaning of the [ICFA] insofar as they involved the misrepresentation or the concealment, suppression or omission of a material fact— *i.e.*, the fact that commercial bail and bond-related services had been eliminated by statute."); *id.* at ¶ 60 ("GovPayNet charged and accepted payments for commercial bail and bond-related services that had been eliminated by statute decades before—a fact it omitted or concealed from Plaintiff and the Class in order to continue obtain amounts far in excess of ordinary credit card processing fees."). Count I's unfair business practice claim also turns on whether Defendant's services violated these statutes, as it alleges that

> 40. GovPayNet charged Plaintiff and the Class for bail and bond-related services which, unbeknownst to them, it could not provide. GovPayNet charged and accepted payments for commercial bail and bond-related services that had been eliminated by statute decades before—a fact it omitted or concealed from Plaintiff and the Class in order to continue obtain[ing] amounts far in excess of ordinary credit card processing fees.

> 41. The above-described practices were unfair within the meaning of the act because they offended Illinois' public policy against commercial bail and bond-related services and were otherwise unethical, oppressive and

> unscrupulous and caused substantial injury to the consumers who paid
> GovPayNet's fees for bail and bond-related services.

[19] at ¶¶ 40, 41.

> Section 110-7 provides that
>
> (a)    The person for whom bail has been set shall execute the bail bond and
> deposit with the clerk of the court before which the proceeding is pending
> a sum of money equal to 10% of the bail, but in no event shall such
> deposit be less than $25. * * *
>
> (f)    When the conditions of the bail bond have been performed and the
> accused has been discharged from all obligations in the cause the clerk of
> the court shall return to the accused or to the defendant's designee by an
> assignment executed at the time the bail amount is deposited, unless the
> court orders otherwise, 90% of the sum which had been deposited and
> shall retain as bail bond costs 10% of the amount deposited. However, in
> no event shall the amount retained by the clerk as bail bond costs be less
> than $5.

725 ILCS 5/110-7(a) & (f). Section 110-8 provides that an accused may instead deposit the full
amount of the bail in cash, stocks, or bonds, or double the amount in real estate; once the
conditions of the bond have been performed, the clerk generally returns the deposit or discharges
the lien without retaining any amount. 725 ILCS 5/110-8(a) & (f). Section 110-15 provides that
"[t]he provisions of Sections 110-7 and 110-8 of this Code are exclusive of other provisions of
law for the giving, taking, or enforcement of bail." 725 ILCS 5/115.

Illinois created these statutes to address the failings of the previous professional bail
system, in which private bail bondsmen generally collected 10% of a bond, retaining that 10%
even if the accused fully satisfied the conditions of bond. *Schilb v. Kuebel*, 404 U.S. 357, 359
(1971). This system was problematic in several respects. First, "a heavy and irretrievable burden
fell upon the accused, to the excellent profit of the bondsman." *Id.* Second, "professional
bondsmen, and not the courts, exercised significant control over the actual workings of the bail
system." *Id.* Third, "the pecuniary loss deterrent to jumping bail which was its central idea was

simply not working in a system where payment of a bond premium was required without regard to performance of conditions." *Schilb v. Kuebel*, 264 N.E.2d 377, 380 (Ill. 1970). Meanwhile, studies from the time showed that "in spite of collecting a 10% [f]ee, actual judgment on forfeitures paid by professional bondsmen amounted to only one per cent of the bonds written." *Id.* The Illinois legislature therefore crafted Sections 110-7 and 110-8, creating a new system in which an accused who has performed the conditions of bond would retain "substantially the amount formerly pocketed by the professional bondsman while allowing to the courts a reasonable fee as bond costs for handling bail bonds and offsetting the monetary amount of any loss resulting from the occasional bail jumper where the professional bondsman under the former system might have forfeited the amount of bail." *Id.* The ultimate objective of the reform was two-fold: "to reduce the cost of liberty to arrested persons awaiting trial" as well as "to regain from professional bondsmen the control of bail releases and restore such control to the courts where it rightfully belongs." *Id.* at 380–81. As the Supreme Court noted, the purpose of the statutes "appears to have been accomplished. It is said that the bail bondsman abruptly disappeared in Illinois due primarily to the success of the ten percent bail deposit provision." *Schilb*, 404 U.S. at 359.

Beginning with the claims of a deceptive business practice in violation of the ICFA (Count II) and fraud (Count IV), the Court first considers whether the statutes prohibit Defendant from providing bail bond services. In interpreting the statutes, the Court "begins where all such inquiries must begin: with the language of the statute itself." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241 (1989). Sections 110-7(a) and 110-8(a) provide that a "person for whom bail has been set shall execute" the bail bond requirements of the statute, and sections 110-7(f) and 110-8(f) provide that "the clerk of the court shall return" a deposit in

accordance with the statute. 725 ILCS 5/110-7(a) & (f). Section 110-15 then provides that these provisions "are exclusive of other provisions of law for the giving, taking, or enforcement of bail." 725 ILCS 5/110-15. These statutes plainly prescribe the conduct of accused individuals and the courts, not commercial entities like Defendant. Had the Illinois legislature wanted to regulate the bail market by directly prescribing the conduct of bail bond service-providers instead, it could have done so, as other states have. See Ky. Rev. Stat. Ann. § 431.510 ("It shall be unlawful for any person to engage in the business of bail bondsman"); Wis. Stat. Ann. § 969.12(2) ("A surety under this chapter shall be a natural person"). Moreover, the fact that the statutes economically may have eliminated private bail bondsmen from the market, see *Schilb*, 404 U.S. at 359, does not change the outcome. A law may create a disincentive to providing services without directly outlawing them. Plaintiff's theory that Defendant deceived Plaintiff by charging him for unlawful services is therefore implausible.

In his response brief, Plaintiff additionally argues that Defendant's services are prohibited under section 110-13, which provides:

> No attorney at law practicing in this State and no official authorized to admit another to bail or to accept bail shall furnish any part of any security for bail in any criminal action or any proceeding nor shall any such person act as surety for any accused admitted to bail.

725 ILCS 5/110-13. This argument fails for the same reason. The statute prescribes the conduct of an "attorney at law" and an "official authorized to admit another to bail or to accept bail," not a commercial entity like Defendant. *Id.* Plaintiff also suggests that Defendant's services are prohibited under section 103-9, which provides that "[n]o bail bondsman from any state may seize or transport unwillingly any person found in this State who is allegedly in violation of a bail bond posted in some other state." 725 ILCS 5/103-9. This bounty hunting statute also is inapposite, as Plaintiff does not allege the seizure or transport of an accused who has violated a

bail bond posted in another state. Plaintiff therefore fails to plausibly allege that Defendant charged him for illegal services. Insofar as Counts II and IV depend on this allegation, they are also implausible. The Court therefore dismisses those Counts under Rule 12(b)(6).

Turning to Count I's claim of an unfair business practice under the ICFA, Plaintiff's first theory of an unfair business practice—again, that Defendant deceived Plaintiff by charging it for an unlawful service—is implausible for the same reason. Plaintiff's second theory is a different matter. It alleges that Defendant committed an unfair business practice by charging Plaintiff not for illegal services but, more generally, for services that "offended Illinois' public policy against commercial bail and bond-related services." [19] at ¶ 41. To determine whether an alleged business act or practice is plausibly unfair within the meaning of the ICFA, courts consider "the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act," 815 ILCS 505/2, which similarly prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45. In 1964, the FTC set forth the following factors (known as the Cigarette Rule or the *Sperry* factors) to determine whether an act or practice is unfair:

> (1) whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness;
>
> (2) whether it is immoral, unethical, oppressive, or unscrupulous;
>
> (3) whether it causes substantial injury to consumers (or competitors or other businessmen).

29 Fed. Reg. 8355 (1964). The Supreme Court cited the Cigarette Rule with approval in *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972). See *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014).

Following the Supreme Court's approval of the Cigarette Rule, the FTC issued a series of rulemakings relying heavily on the broad public policy prong, most prominently its proposed ban on all television advertising directed at very young children. See J. Howard Beales III, *The FTC's Use of Unfairness Authority: Its Rise, Fall and Resurrection* (2003), part II (A) & (B), *available at* https://www.ftc.gov/public-statements/2003/05/ftcs-use-unfairness-authority-its-rise-fall-and-resurrection ("The result was a series of rulemakings relying upon broad, newly found theories of unfairness that often had no empirical basis, could be based entirely upon the individual Commissioner's personal values, and did not have to consider the ultimate costs to consumers of foregoing their ability to choose freely in the marketplace."); FTC Staff Report on Television Advertising to Children (February 1978); Notice of Proposed Rulemaking on Television Advertising to Children, 43 Fed. Reg. 17,967 (1978). Public controversy arose, and the Consumer Subcommittee of the Senate's Committee on Commerce, Science, and Transportation informed the FTC that it planned to hold oversight hearings addressing the potential breadth of "unfairness" as applied to consumer transactions. See FTC Policy Statement on Unfairness (Dec. 17, 1980).

In its responsive Policy Statement on Unfairness, the FTC "recognize[d] that the concept of consumer unfairness is one whose precise meaning is not immediately obvious, and also recognize[d] that this uncertainty has been honestly troublesome for some businesses and some members of the legal profession. This result is understandable in light of the general nature of the statutory standard." *Id.* In light of this concern, the FTC delineated a new unfairness test, stating that "[u]njustified consumer injury" would be the most important factor. *Id.* To be unfair, an injury would have to be "[1] substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that

consumers themselves could not reasonably have avoided." *Id.* The Commission rejected the former "immoral, unscrupulous, or unethical" criteria, reasoning that these factors merged with the rest of the analysis, as conduct that is truly unethical or unscrupulous will almost always injure consumers or violate public policy. *Id.* Lastly, it explained that the proper role of public policy would usually be as "additional evidence on the degree of consumer injury caused by specific practices," reserving an exception where public policy was "so clear that it will entirely determine the question of consumer injury, so there is little need for separate analysis by the Commission." *Id.* In 1994, Congress codified this new net-injury test in 15 U.S.C. § 45(n) while foreclosing the FTC's exception:

> The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

15 U.S.C. § 45(n).

Despite this change in federal law and the language in the ICFA indicating that it should be construed in consideration of Section 5(a) of the FTC Act, Illinois courts generally apply the Cigarette Rule. See *Sheffler v. Commonwealth Edison Co.*, 955 N.E.2d 1110, 1127 (Ill. 2011) (quoting *Robinson*, 775 N.E.2d at 961). Under Illinois law, "[a]ll three criteria do not need to be satisfied to support a finding of unfairness [under the ICFA]. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 961). Because Illinois courts continue to use the Cigarette Rule, federal courts do as well. See *Batson*, 746 F.3d at 830 ("Illinois recognizes the *Sperry* test, and so we too will use it as our point of departure.").

Beginning with the first factor, Plaintiff plausibly alleges that Defendant's conduct may offend the public policy of 725 ILCS 5/110-7, 110-8, and 110-15. As explained above, these statutes have two main policy objectives: "to reduce the cost of liberty to arrested persons awaiting trial" as well as "to regain from professional bondsmen the control of bail releases and restore such control to the courts where it rightfully belongs." *Schilb*, 264 N.E.2d at 380–81; see also *Schilb*, 404 U.S. at 359. Defendant's charge (8% of the deposit or .8% of face value) plausibly implicates at least the first policy insofar as it almost doubles the cost of liberty beyond the court's retention-charge (1% of face value). The charge could offend the public policy of the statutes particularly in the case of large deposits. Defendant's services also may implicate the second policy. Plaintiff alleges that Cook County outsourced some of its bail-related work to Defendant. Depending on the nature of the services, the outsourcing may offend the statute's goal of shifting control over bail-related services from the private sector to the courts. In his response (though not in his complaint), Plaintiff contends that Defendant provided the following bail and bond services:

> completion and processing of bail related reports; validation of government agency data; discussions with the governmental entity staff; provision of technological services designed and developed to expedite bail payments; suggested process improvements; training and support by GovPayNet field staff; the handling of all chargebacks and card holder contacts regarding payment status and issues; and following up with correctional facility staff to ensure that all requirements related to prisoner release have been met.

*Id.* at *1 (citing Def.'s 1st Am. Compl. at ¶ 20). Plaintiff contends that the Court may take judicial notice of these services because Defendant itself alleged that it provided them in *Gov't Payment Serv., Inc. v. LexisNexis VitalChek Network, Inc.*, 2012 WL 1952905, at *1 (N.D. Ill. May 29, 2012). See *Enquip, Inc. v. Smith-McDonald Corp.*, 655 F.2d 115, 118 (7th Cir. 1981) ("[An admission] from one proceeding is indeed admissible and cognizable as an admission in another."). Defendant, however, suggests that a judicial admission in one case only can be

considered an evidentiary admission in another. See *Grant Importing & Distrib. Co. v. Amtec Int'l of N.Y. Corp.*, 2010 WL 706042, at *3 (N.D. Ill. Feb. 24, 2010) ("[A] judicial admission made in one action is 'admissible and cognizable as an admission in another [action],' but only as evidence." (quoting *Enquip*, 655 F.2d at 118)). For the purposes of this motion, the Court need not address the issue for two reasons. First, as stated above, Plaintiff already alleges facts plausibly implicating the first policy objective of the statutes. As to the second policy objective, Plaintiff's allegation that Cook County outsources bail and bond services is plausible based on VISA's alleged agreement to allow Defendant to charge a merchant fee (as opposed to a payment processing fee). Because the Illinois statutes aimed to shift bail and bond services from the private sector to the courts, this allegation is "enough fact to raise a reasonable expectation that discovery will reveal evidence" that Defendant charges a merchant fee for bail and bond services that may offend the public policy of the Illinois statutes. *Twombly*, 550 U.S. at 545.

Turning to the second factor, the charge may have been "so oppressive as to leave the consumer with little alternative except to submit to it," *Robinson*, 775 N.E.2d at 961 (citing *Saunders v. Mich. Ave. Nat. Bank*, 662 N.E.2d 602, 608 (Ill. App. Ct. 1996)); that is, many cardholders plausibly "had no reasonable alternative but to pay," *People ex rel. Fahner v. Hedrich*, 438 N.E.2d 924, 929 (Ill. App. Ct. 1982), insofar as their options may have been to pay or go to (or remain in) jail. As to the third factor, the charge may well cause substantial injury, particularly in the case of large bails. On balance, application of the three factors makes Plaintiff's claim of an unfair business practice plausible under Rule 12(b)(6).

Defendant also moves to dismiss Count I under Rule 9(b), but Rule 9(b) does not apply. "Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet

the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008).

Lastly, Defendant argues that liability under Counts I, II, or IV would be unconstitutional, as there is no statutory definition of "bail bondsman" or "bail and bond-related services." [25] at 8. It contends that unless Defendant is given a "reasonable opportunity to know specifically what conduct is prohibited" based on some statutory definition, "the protections of the Due Process Clause must prevent a court from finding in Plaintiff's favor." *Id.* at 8–9. Construing Defendant's argument as a void-for-vagueness challenge, the question then is whether the ICFA, as applied in Count I (the only remaining of the three counts), is void for vagueness.

A law may be unconstitutionally vague under the due process clause "if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). To be sufficiently clear, a statute must "provide 'fair warning' as to what conduct will subject a person to liability" and "contain an explicit and ascertainable standard to prevent those charged with enforcing the statute's provisions from engaging in 'arbitrary and discriminatory' enforcement." *Id.* (quoting *Grayned*, 408 U.S. at 108–09). The void for vagueness doctrine rests on the following principles:

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (quoting *Grayned*, 408 U.S. at 108–09) (internal quotation marks omitted).

These principles are not to be "mechanically applied." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982); *Karlin*, 188 F.3d at 458. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Karlin*, 188 F.3d at 458 (quoting *Vill. of Hoffman Estates*, 455 U.S. at 498). The Constitution tolerates less vagueness in statutes imposing criminal penalties and statutes that threaten to implicate constitutional rights. *Karlin*, 188 F.3d at 458. In contrast, "economic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Vill. of Hoffman Estates*, 455 U.S. at 498 (footnotes omitted). The Supreme Court also has recognized that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id.* at 499.

To the extent that Defendant argues that the ICFA, as applied in Count I, fails to provide fair warning as to what bail and bond services could be unfair, the Illinois Supreme Court rejected a similar argument almost thirty years ago:

> The Association finds the word "unfair," as in the phrases "unfair methods of competition" and "unfair * * * acts or practices * * * in the conduct of any trade or commerce," particularly ambiguous and objectionable. However, this very language—taken from section 5(a) of the Federal Trade Commission Act—has a venerable history of interpretation and definition by the Federal courts, and now can be said to have a well-settled meaning in Federal trade-regulation law. (See *Federal Trade Com. v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972); *Spiegel, Inc. v. Federal Trade Com.*, 540 F.2d 287 (7th Cir. 1976)). The statutory

references to the Federal courts' interpretations and to section 2 of the Deceptive Trade Practices Act further define and clarify its meaning.

The terms "unfair practice" and "unfair methods of competition" are inherently insusceptible of precise definition. As we recognized when the issue of the vagueness of section 2 was first before us, effective regulation requires that the concept be flexible, defined on a case-by-case basis, "in view of the futility of attempting to anticipate and enumerate all the (unfair) methods" and practices that fertile minds might devise. (*Fitzgerald v. Chicago Title & Trust Co.*, 380 N.E.2d 790 (Ill. 1978). * * * Greater leeway in definition is allowed the legislature in the context of regulatory statutes governing business activities. (*Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). *United States v. National Dairy Products Corp.* 372 U.S. 29 (1963) (Robinson–Patman Act).) We therefore hold that the terms "unfair methods of competition" and "unfair acts or practices" have a sufficiently definite and well-established meaning to overcome the charge of vagueness, and join the courts of other States that have so held with respect to comparable legislation. *Department of Legal Affairs v. Rogers*, 329 So. 2d 257, 267 (Fla. 1976); *State v. Reader's Digest Association, Inc.*, 501 P.2d 290 (1972); *State ex rel. Sanborn v. Koscot Interplanetary, Inc.*, 512 P.2d 416 (1973).

*Scott v. Ass'n for Childbirth at Home, Int'l*, 430 N.E.2d 1012, 1018 (Ill. 1981). The applicability of the Illinois Supreme Court's reasoning is unclear 24 years later. The year before the court issued *Scott*, the FTC issued its 1980 Policy Statement on Unfairness acknowledging concern with the expansiveness of its unfairness test and modifying the Cigarette rule accordingly. Meanwhile, Illinois has continued to use the Cigarette Rule, developing decades of its jurisprudence interpreting and defining unfairness.

In any event, the Court need not decide the issue at this time. A court considers whether a statute meets is void for vagueness "as applied to the particular facts at issue." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010); accord *Chapman v. United States*, 500 U.S. 453, 467 (1991) ("[A] vagueness claim must be evaluated as the statute is applied to the facts of this case."); *United States v. Jones*, 689 F.3d 696, 702 (7th Cir. 2012) ("Vagueness challenges are normally evaluated in light of the particular facts of the case, not in general.").[4] At this early

---

[4] In *Jones*, the Seventh Circuit also noted that a statute may be "impermissibly vague regardless of the application facts in the case" because it "simply has no core and lacks any ascertainable standard for

stage in the litigation, the facts regarding Defendant's services are too undeveloped to assess the merits of Defendant's argument, making consideration of a void-for-vagueness defense more appropriate at a future time.[5]

### C. Unjust Enrichment

Lastly, Defendant moves to dismiss Count III's unjust enrichment claim under Rule 12(b)(6), arguing that, under Illinois law, unjust enrichment is not an independent cause of action. "Illinois law is arguably somewhat confused on whether a claim of unjust enrichment requires an underlying tort or breach of contract or whether, instead, there can be a free-standing claim based on the proposition that it would be unjust for the defendant to retain a benefit that it obtained at the plaintiff's expense." *Stevens v. Interactive Fin. Advisors, Inc.*, 2015 WL 791384, at *16 (N.D. Ill. Feb. 24, 2015). As the Seventh Circuit noted in *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 516 (7th Cir. 2011), the Illinois Supreme Court appears to recognize unjust enrichment as an independent cause of action. See *Raintree Homes, Inc. v. Vill. of Long Grove*, 807 N.E.2d 439, 445 (Ill. 2004) ("Here, plaintiffs have no substantive claim grounded in tort, contract, or statute; therefore the only substantive basis for the claim is restitution to prevent unjust enrichment."); *Indep. Voters v. Ill. Commerce Comm'n*, 510 N.E.2d 850, 852–58 (Ill. 1987) (approving refunds for excessive utility charges where plaintiffs brought a claim for restitution untied to another cause of action); *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545

---

inclusion and exclusion," making it vague "not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Jones*, 689 F.3d 702 (citations and internal quotation marks omitted). Based on the clearly defined elements of an unfair business practice claim brought under the ICFA and the three prongs of the Cigarette Rule, this action does not fall within this category of cases.

[5] Should the parties continue litigating this issue, they may wish to address the degree of vagueness permissible here, see *Vill. of Hoffman Estates*, 455 U.S. at 498–99, the persuasiveness of *Scott*, 430 N.E.2d at 1018 as applied to the facts of this case today, and the applicability, in any, of *Consumer Fin. Prot. Bureau v. ITT Educ. Servs., Inc.*, 2015 WL 1013508, at *18 (S.D. Ind. Mar. 6, 2015), appeal pending.

N.E.2d 672, 679 (Ill. 1989) (articulating the elements of unjust enrichment without reference to a separate underlying claim in tort, contract, or statute); *Peddinghaus v. Peddinghaus*, 692 N.E.2d 1221, 1225 (Ill. App. Ct. 1998) (ruling that Illinois recognizes an independent cause of action for unjust enrichment based on *HPI Health Care Services*)). Yet "there is a recent Illinois appellate court that suggests the opposite, namely, that an unjust enrichment claim cannot stand untethered from an underlying claim." *Cleary*, 656 F.3d at 516. As the Illinois Appellate Court recently stated,

> *Unjust enrichment is not a separate cause of action that, standing alone, will justify an action for recovery.* Rather, it is a condition that may be brought about by unlawful or improper conduct as defined by law, such as fraud, duress, or undue influence, and may be redressed by a cause of action based upon that improper conduct. When an underlying claim of fraud, duress or undue influence is deficient, a claim for unjust enrichment should also be dismissed.

*Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 928 (Ill. App. Ct. 2009) (emphasis added).

Without definitively resolving the issue, the Seventh Circuit attempted to reconcile this apparent conflict in Illinois law by explaining that a claim of unjust enrichment arises when a defendant unjustly retains a benefit to the plaintiff's detriment. The retention of the benefit is often unjust because of some improper conduct that simultaneously gives rise to a claim in tort, contract, or statute. Because the unjust enrichment claim and the related claim arise from the same improper conduct, they frequently rise or fall together. See *Cleary*, 656 F.3d at 517 (citing *Ass'n Benefit Servs. v. Caremark Rx, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007); see also *Stevens v. Interactive Fin. Advisors, Inc.*, 2015 WL 791384, at *16. In any event, to the extent there is any conflict in Illinois law, "[t]he Illinois Supreme Court's pronouncements, of course, trump those of lower Illinois courts." *Stevens*, 2015 WL 791384, at *16. All of this is to give the parties guidance as the litigation proceeds. For now, any apparent conflict between Illinois Supreme

Court and Illinois Appellate Court case law does not change the outcome. Plaintiff does not bring a free-standing claim of unjust enrichment; as discussed above, he also states an ICFA claim. Accordingly, Defendants' motion to dismiss Count III is denied.

**IV.    Conclusion**

For the foregoing reasons, the Court grants Defendant's motion to dismiss [24] in part, dismissing Counts II and IV.  In addition, the motion for an extension of time to complete class discovery [36] is granted; class discovery deadline is extended to 8/31/2015.  Status hearing set for 6/9/2015 is stricken and reset to 8/25/2015 at 9:00 a.m.

Dated: June 4, 2015                        _____
                                           Robert M. Dow, Jr.
                                           United States District Judge